# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00262-CV

**Cadena Comercial USA Corp. d/b/a OXXO, Appellant**

**v.**

**Texas Alcoholic Beverage Commission, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
## NO. D-1-GN-13-000814, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## O P I N I O N

Cadena Comercial USA Corp. d/b/a OXXO (Cadena) challenges an administrative order denying its original application for a wine and beer retailer's off-premise permit. *See* Tex. Alco. Bev. Code §§ 26.01-.08 (governing wine and beer retailer's off-premise permit). The County Judge of Travis County, acting in his administrative capacity as a hearing officer for the Texas Alcoholic Beverage Commission (TABC), determined that granting Cadena's permit application would violate provisions in the Texas Alcoholic Beverage Code that prohibit "tied house" relationships among the three tiers of the alcoholic-beverage industry—manufacturers, distributors, and retailers. *See id.* §§ 6.03(i) (state has public policy of "strict separation" of three tiers of alcoholic-beverage industry "to prevent the creation or maintenance of a 'tied house' as described and prohibited in Section 102.01" of Code); 102.01(a), (b) (requiring "strict adherence to a general policy of prohibiting the tied house and related practices," including "overlapping ownership interests or other prohibited relationships" between tiers); 102.01-.32 (identifying expressly prohibited business practices, relationships, and dealings). In Cadena's suit for judicial

review, the district court affirmed the administrative order. *See* Tex. Gov't Code § 2001.174 (governing judicial review of administrative order). On appeal to this Court, Cadena contends it is entitled to the requested permit as a matter of law. The issues presented concern the proper construction of the statutory tied-house prohibitions and their application to the undisputed facts. We will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Cadena, a Texas corporation, is a wholly owned indirect subsidiary of Fomento Economico Mexicano, S.A.B. de C.V. (FEMSA), a Mexican corporation that owns and operates thousands of convenience stores in Mexico under the brand name "OXXO." Cadena was organized to own and operate OXXO convenience stores in Texas under a business plan that requires Cadena to obtain a wine and beer retailer's off-premise permit from the TABC for each Texas location.

In pursuit of that economic endeavor, Cadena filed a permit application with the TABC for its initial location in Texas and, partly of its own accord and partly at the TABC's request, provided additional information that disclosed its entire corporate structure. That information revealed that, in addition to FEMSA's indirect interest in Cadena, FEMSA, through several intermediary companies, holds a non-controlling stock interest in companies that maintain Texas non-resident manufacturers permits but have no business premises in Texas: Heineken Italia, Heineken Browerijen, and CCM (the Heineken brewers). The following is a simplified chart reflecting the relevant corporate relationships:[1]

---

[1] The actual corporate structure of the key players in this appeal involves multiple intervening layers and a variety of ownership interests and structures. The parties agree, however, that the attached chart adequately reflects the relevant corporate structure for purposes of the issues on appeal.

# FEMSA Ownership Structure

# Heineken Ownership Structure



3

Although FEMSA had at one time owned the CCM brewery in Mexico, it sold its interest in that brewery in 2010 in exchange for a combined 20% stock participation in Heineken Holding and Heineken NV (collectively, the Heineken parent companies), which effectively hold all or a controlling share of the stock in the Heineken brewers.[2] A corporate governance agreement entered into in connection with that transaction allows FEMSA to appoint 20% of the directors on Heineken NV's supervisory board and 20% of Heineken Holding NV's board of directors. The agreement further prohibits FEMSA from directly or indirectly increasing its stock ownership in Heineken NV and forbids the Heineken parent companies from directly or indirectly owning stock in FEMSA. Thus, FEMSA's direct and indirect ownership interest in Heineken NV is capped at 20%, and the Heineken parent companies own no interest in FEMSA or its affiliates.

After considering this information, the TABC notified Cadena that it was protesting the permit application because, in the TABC's opinion, the permit could not be granted without running afoul of provisions in the Alcoholic Beverage Code that prohibit "tied house" relationships between the different tiers of the alcoholic-beverage industry. A "tied house" is statutorily defined as

> any overlapping ownership or other prohibited relationship between those engaged in the alcoholic beverage industry at different levels, that is, between a manufacturer and a wholesaler or retailer, or between a wholesaler and a retailer, as the words "wholesaler," "retailer," and "manufacturer" are ordinarily used and understood . . . .

Tex. Alco. Bev. Code § 102.01(a). Texas public policy, as set forth in the Code, requires "strict separation between the manufacturing, wholesaling, and retailing levels" of the alcoholic-beverage industry operating in this state "to prevent the creation or maintenance of a 'tied house.'" *Id.*

---

[2] According to Cadena's filings, Heineken Holding NV owns a controlling interest in Heineken NV, which directly or indirectly holds all the stock in the Heineken brewers.

§ 6.03(j); *see id.* §§ 102.01-.32 (reiterating requirement of "strict adherence to a general policy of prohibiting the tied house and related practices," and delineating activities and intra-industry relationships that are expressly prohibited even in absence of overlapping ownership interests).

In the protest notice, the TABC alleged that Cadena's permit application contravened the general prohibition against tied houses and related practices, *see id.* § 102.01(a) (tied house definition), (b) (mandating strict adherence to policy prohibiting tied houses and related practices), and the following specific statutory provisions:

1. Tex. Alco. Bev. Code § 102.01(c): "No person having an interest in a permit issued under Subtitle A, Title 3 of this code [governing permits] may secure or hold, directly or indirectly, an ownership interest in the business or corporate stocks, including a stock option, convertible debenture, or similar interest, in a permit or business of a permittee of a different level who maintains licensed premises in Texas."

2. Tex. Alco. Bev. Code § 102.01(h): "No permittee may enter with a permittee of a different level or with another person or legal entity into a conspiracy or agreement to control or manage, financially or administratively, directly or indirectly, in any form or degree, the business or interests of a permittee of a different level."

3. Tex. Alco. Bev. Code § 102.07(a)(1): "Except [as otherwise provided], no person who owns or has an interest in the business of a distiller, brewer, rectifier, wholesaler, Class B wholesaler, winery, or wine bottler, nor the agent, servant, or employee of such person, may: (1) own or have a direct or indirect interest in the business, premises, equipment, or fixtures of a retailer . . . ."

4. Tex. Alco. Bev. Code § 102.11(1): "No manufacturer or distributor directly or indirectly, or through a subsidiary, affiliate, agent, employee, officer, director, or firm member may: (1) own any interest in the business or premises of a retail dealer of beer . . . ."

Although the factual underpinnings for the protest were not stated in the notice, the TABC later disclosed that it opposed Cadena's permit application based on FEMSA's

relationship with Cadena (at the retail level) and the Heineken brewers (at the manufacturer level). Cadena, on the other hand, characterized FEMSA's interest in the Heineken brewers as remote, attenuated, and non-controlling and, thus, an acceptable cross-tier relationship under the relevant statutory provisions.

As a result of FEMSA's inability or unwillingness to divest itself of its indirect shareholder's interest in the Heineken brewers, the matter proceeded to an evidentiary hearing before the county judge. *See id.* §§ 61.31 (governing hearing before county judge on application for a license), .32 (governing protest hearing by county judge); *see also id.* § 26.03 ("The qualifications of applicants and the application for and issuance of [a wine and beer retailer's off-premise] permit are governed by the same provisions which apply to application for and issuance of a retail dealer's off-premise license.").[3] In the administrative proceeding, the TABC asserted several mandatory and discretionary grounds for denying Cadena's application for a retail permit, including that there were reasonable grounds to believe that:

1. "the place or manner in which the applicant for a retail dealer's license may conduct his business warrants a refusal of a license based on the general welfare, health, peace, morals, safety, and sense of decency of the people," *id.* § 61.42(a)(3);

2. "the applicant for a retail dealer's license will conduct business in a manner contrary to law or in a place or manner conducive to a violation of the law," *id.* § 61.43(a)(9); and

3. "the applicant has a real interest in the business or premises of the holder of a manufacturer's or distributor's license," *id.* § 61.44(b)(1).

---

[3] Although sections 61.31 and 61.32 were amended after Cadena filed its permit application, we cite the current version of the statute for convenience and because the amendments to the statute, though substantive in nature, are not germane to the issues on appeal.

Under agreed stipulations filed in the administrative proceeding, the corporate relationships among Cadena, FEMSA, and the Heineken brewers were undisputed. The TABC further stipulated that (1) other than the statutory provisions cited in the protest notice, there is no impediment under the TABC's regulations for the operation of the requested retailer's permit at the requested location, (2) the statutory provisions cited in the protest notice are the TABC's sole grounds for objecting to Cadena's application, and (3) but for those provisions, Cadena would be entitled to the requested permit at the location named in its permit application.

At the evidentiary hearing before the county judge, the TABC and its two witnesses—the TABC's licensing director and an expert in laws governing the alcoholic-beverage industry—took the position that even one overlapping share of stock ownership, whether direct or indirect, would violate the statutory tied-house prohibitions (the "one-share standard"). However, the TABC maintained that, at a minimum, the 20% overlapping ownership interest that exists among FEMSA, Cadena, and the Heineken brewers is sufficient to satisfy any definition of a prohibited "interest" that would be ascribed to that term's various uses in the relevant statutory provisions. Although disputing that actual control is required to implicate the pertinent tied-house restrictions, the TABC asserted that FEMSA's ability to appoint 20% of the directors to the Heineken parent companies' boards would satisfy any reasonable control requirement embodied in the Alcoholic Beverage Code's tied-house prohibitions and that, given such control, FEMSA's cross-tier relationships must be imputed to Cadena (its wholly owned subsidiary) for purposes of regulation under the Code.

According to Cadena, however, the only interest sufficient to offend the tied-house prohibitions is one that would allow actual financial or administrative *control* among the tiers. Viewing the statute in this way, Cadena asserted that its permit application must be granted as a

7

matter of law because, under applicable foreign law, FEMSA has no right to manage or control the business of either the Heineken parent companies or the Heineken brewers, and as a result, granting Cadena's permit application would not result in any of the relevant entities' having control at more than one level of the industry. Cadena further argued that FEMSA's relationship with the Heineken brewers is simply too remote and attenuated to implicate historical tied-house concerns relating to control and industry monopolization and that any construction of the statute must be limited to that historical context. *See Neel v. Texas Liquor Control Bd.*, 259 S.W.2d 312, 316 (Tex. Civ. App.—Austin 1953, writ ref'd n.r.e.) (observing that "[t]he term 'tied house' has been frequently used to describe the relationship between a wholesale and retail liquor dealer under conditions giving the wholesaler practical control over the business of the retailer" and that "one result of such control could be the creation of a monopoly for certain brands of liquors as well as dictating prices"). Cadena also asserted that any statutory provision that imposes ownership limitations on an applicant, permittee, manufacturer, or retailer does not apply as a matter of law because (1) Cadena and the Heineken brewers are the only entities that meet the statutory definitions of those terms, (2) no ownership interests flow between those entities, and (3) FEMSA's ownership interests cannot be imputed to either of these entities without veil-piercing.

To that point, Cadena's president, Carlos Aldrete, testified that the flow of corporate ownership goes down from FEMSA to Cadena and down and across from FEMSA to the Heineken parent companies and down from the Heineken parent companies to the Heineken brewers, but there is no ownership interest that flows *from* any of the Heineken entities to either Cadena or FEMSA, either directly or indirectly. Likewise, there is no ownership interest that flows *from* Cadena to FEMSA or to the Heineken brewers. That is, the Heineken brewers, themselves, do not own any direct or indirect interest in FEMSA or Cadena, and Cadena does not, itself, own any direct or

8

indirect interest in FEMSA or the Heineken brewers. Aldrete further testified that nothing in the corporate governance agreement between FEMSA and the Heineken parent companies permits FEMSA to control the Heineken brewers, and vice versa.

Cadena also decried the one-share standard being advanced by the TABC as arbitrary, overly broad, unenforceable, and extra-textual. In support of that view, Dr. William Charlton, a corporate-finance expert, testified that, viewed as broadly as the TABC suggests, there is, in fact, widespread cross-tier ownership of publicly traded companies holding TABC permits or licenses at different tiers, including billions of dollars of such investments held by the State of Texas. He opined that, in light of the complexities of modern business arrangements, it would be virtually impossible for the TABC to discover and regulate all cross-tier investment holdings in the alcoholic-beverage industry, if the statute were so viewed.

After considering testimony and documentary evidence admitted at the administrative hearing, the county judge issued an order denying Cadena's permit application. In the order, the county judge adopted the parties' agreed stipulations and found, among other things, that (1) Cadena "has a real interest in the business or premises of the holder of a manufacturer's or distributor's license"; (2) "[f]or licensing purposes, as a subsidiary of FEMSA, [Cadena] is a manufacturer"; (3) "[f]or licensing purposes, as a subsidiary of FEMSA, [Cadena] has an interest in the business of a brewer"; and (4) issuing "the requested permit would violate Sections 102.01(c), (h), 102.07(a)(1), and 102.11(1) of the [Alcoholic Beverage] Code." In conclusions of law, the county judge ruled that the permit application was denied on all of the mandatory and permissive grounds for refusal the TABC had cited. *See* Tex. Alco. Bev. Code §§ 61.42(a)(3), .43(a)(9), .44(b)(1).

After exhausting administrative remedies, Cadena filed the underlying suit for judicial review, and the district court affirmed the county judge's administrative order. On appeal to

9

this Court, the parties dispute the construction and application of the various tied-house provisions at issue in this case but not the material facts.

## DISCUSSION

As in the proceedings below, Cadena contends on appeal that the administrative order denying its permit application was based on an erroneous construction of the relevant statutory provisions. The core notion embodied in Cadena's three appellate issues is that a disqualifying cross-tier interest exists only when a business at one tier can "control" a business at another tier. According to Cadena, failure to apply such a control standard to the applicable statutory provisions ignores the language and historical purpose of the tied-house prohibitions and results in a construction of the statute that is unconstitutionally vague, denies equal protection to similarly situated entities, and permits arbitrary and discriminatory enforcement. Cadena further complains that none of the statutes at issue can be properly read as applying to Cadena's business relationships except in derogation of defined statutory terms and corporate-veil-piercing principles.

Cadena's issues present questions of law, which we review de novo even in an appeal subject to substantial-evidence review under the Administrative Procedure Act (APA). *See, e.g.*, *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) (statutory construction is question of law that is reviewed de novo); *State v. Hodges*, 92 S.W.3d 489, 494 (Tex. 2002) (claims regarding deprivation of constitutional rights present questions of law and are thus reviewed de novo (citing *Perry v. Del Rio*, 67 S.W.3d 85, 91 (Tex. 2001))); *Texas Dep't of Pub. Safety v. Stanley*, 982 S.W.2d 36, 37 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (questions of law are reviewed de novo in APA appeal); *see also* Tex. Alco. Bev. Code § 11.67 (appeal from refusal of license or permit shall be

10

under substantial-evidence rule); Tex. Gov't Code § 2001.174 (mandating substantial-evidence review of administrative order).

The administrative order in the present case cites several statutory grounds for denying Cadena's permit application. As Cadena concedes, we may affirm the trial court's judgment on any one of the grounds provided in the administrative order. *See, e.g.*, *Garza v. Texas Alcoholic Bev. Comm'n*, 138 S.W.3d 609, 613 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("[R]egardless of the county judge's stated reasons for its order, a reviewing court may uphold the decision provided there is *any* valid basis for it in the record . . . [or] . . . if there is substantial evidence to support *one* of the reasons given for the judge's decision." (citations omitted)). Cadena contends, however, that none of the cited statutes, if properly construed, provide a basis for denying its permit application.

Because statutory construction is at the heart of the underlying dispute, we begin our analysis by reviewing the pertinent statutory-construction principles. Our objective in construing a statute is to ascertain legislative intent. *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008). We discern legislative intent primarily from the statute's language because it is "'the truest manifestation' of what lawmakers intended . . . ." *Id.* (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651–52 (Tex. 2006)). If statutory language is unambiguous, we will interpret and apply the statute according to its plain meaning unless a different meaning is apparent from the context or the plain meaning leads to absurd results. *In re Ford Motor Co.*, ___ S.W.3d ___, No. 12-0957, 2014 WL 2994622, at *13 (Tex. July 3, 2014) (orig. proceeding). In determining a statute's meaning, we consider the statute as a whole rather than construing specific provisions in isolation. *Id.* Undefined terms are therefore afforded their ordinary meaning unless a different or more precise definition is apparent from the context of the statute, *see* Tex. Gov't Code § 311.011(a); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011), because

11

we cannot give an undefined term a meaning that is disharmonious or inconsistent with other provisions in the statute, *see Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). When a statutory term is specially defined, we are bound by the statutory definition. Tex. Gov't Code § 311.011(b); *see also TGS-NOPEC*, 340 S.W.3d at 439.

In ascertaining the legislature's intent, we may also consider other matters, including the law's objective and the consequences of a particular construction. *See* Tex. Gov't Code § 311.023. Indeed, it has long been a rule of statutory construction that "a statute is to be construed with reference to its manifest object, and if the language is susceptible of two constructions, one of which will carry out and the other defeat such manifest object, [the statute] should receive the former construction." *Citizens Bank v. First State Bank*, 580 S.W.2d 344, 348 (Tex. 1979); *see Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996) ("[W]e must reject interpretations of the statute that defeat the purpose of the legislation so long as another reasonable interpretation exists."). If possible, we will construe a statute in a manner that renders it constitutional if such construction is consistent with the statute's plain language and effectuates the legislature's intent. *See Texas Mun. League Intergovernmental Risk Pool v. Texas Workers' Comp. Comm'n*, 74 S.W.3d 377, 381 (Tex. 2002).

With these principles in mind, we turn now to the pertinent provisions of the Texas Alcoholic Beverage Code. Among other grounds for denying Cadena's permit application, the county judge determined that granting the application would result in a violation of section 102.07(a)(1) of the Code, which provides:

> Except [as otherwise provided], no person who owns or has an interest in the business of a distiller, brewer, rectifier, wholesaler, Class B wholesaler, winery, or wine bottler, nor the agent, servant, or employee of such person, may:

12

(1) own or have a direct or indirect interest in the business, premises, equipment, or fixtures of a retailer . . . .

Tex. Alco. Bev. Code § 102.07(a)(1). This provision is located in chapter 102 of the Code, which governs prohibited intra-industry relationships and business dealings and is encompassed in the regulatory and penal portion of the Code. Chapter 102 is part of a comprehensive statutory scheme regulating the alcoholic-beverage industry in Texas with the stated objective of advancing the state's overarching interest in protecting "the welfare, health, peace, temperance, and safety of the people of [this] state." *Id.* § 1.03; *Dickerson v. Bailey*, 336 F.3d 388, 397 (5th Cir. 2003) ("The [Texas Alcoholic Beverage Code] is a compilation of statutes that regulate the production, distribution, sale, and consumption of all alcoholic beverages within Texas."). The legislature has expressly mandated that we construe the Code liberally to accomplish that purpose. Tex. Alco. Bev. Code § 1.03.

Further embodied in the Code is an express policy of "strict separation between the manufacturing, wholesaling, and retailing levels" of the alcoholic-beverage industry operating in this state for the purpose of preventing "the creation or maintenance of a 'tied house' as described and prohibited in Section 102.01 of [the] code." *Id.* § 6.03(j). Section 102.01 reiterates the state's "general policy of prohibiting the tied house *and* related practices" and defines "tied house" to mean "*any* overlapping ownership or other prohibited relationship" among the three tiers of the alcoholic-beverage industry. *Id.* § 102.01(a), (b) (emphases added). These provisions reflect the legislature's determination that the three tiers are to remain independent of each other. *See Neel*, 259 S.W.2d at 316 (observing that, in enacting comprehensive regulatory scheme, "'The Legislature . . . expressly determined that the liquor traffic in this State would be best controlled by keeping the various levels of the liquor industry independent of each other, and to that end provided . . . that "All

13

of its provisions shall be liberally construed for the accomplishment of that purpose.'"'" (quoting *Texas Liquor Control Bd. v. Continental Distilling Sales Co.*, 199 S.W.2d 1009, 1014 (Tex. Civ. App.—Dallas 1947, writ ref'd n.r.e.)). The three-tier division of the alcoholic-beverage industry mandated by the legislature "aid[s] Texas in the regulation and control of alcohol consumption, and 'prevents companies with monopolistic tendencies from dominating all levels of the alcoholic beverage community.'" *Dickerson*, 336 F.3d at 397 (quoting *S.A. Disc. Liquor, Inc. v. Texas Alcoholic Beverage Comm'n*, 709 F.2d 291, 293 (5th Cir. 1983)). As a matter of historical fact, "the liquor business has been the subject of severe legislative restraints," and "[c]ourts have long recognized that the State has broad power to control the liquor business and restrict the scope of its operation, so long as the restriction is not arbitrary." *Mayhue's Super Liquor Store, Inc. v. Meiklejohn*, 426 F.2d 142, 147 (5th Cir. 1970).

It is within this statutory and historical context that we construe the terms used in section 102.07(a)(1). Pertinent to our analysis is the meaning of the terms "person," "brewer," and "retailer" and the phrases "owns or has an interest in the business" and "own or have a direct or indirect interest in the business." *See* Tex. Alco. Bev. Code § 102.07(a)(1). As defined in the Code, "'person' means a natural person or association of natural persons, trustee, receiver, partnership, corporation, organization, or the manager, agent, servant, or employee of any of them." *Id.* § 1.04(6). FEMSA, the Heineken brewers, and Cadena all satisfy the statutory definition of the term "person." The other terms and phrases are undefined, but it is either undisputed or indisputable that the Heineken brewers fall into the category of "brewer" and Cadena, if its permit application were granted, would be a "retailer" as those terms are ordinarily used and understood. *See id.* § 102.01(a) (stating that term "retailer" bears its commonly used and understood meaning); *see also American Heritage Dictionary of the English Language* 230 (5th ed. 2011) (defining "brew" to mean "[t]o

14

make ale or beer as an occupation" and "brewery" as "[a]n establishment for the manufacture of malt liquors, such as beer and ale"); *cf.* Tex. Alco. Bev. Code §§ 102.32 (defining "retailer" for purposes of that section to include "wine and beer retailer's off-premise . . . permittee"); .54 (defining "retailer" for purposes of that section to mean "a person who holds a permit or license issued under Chapters 25 through 34, Chapter 48, Chapters 69 through 72, or Chapter 74" of the Code).[4]

Substituting the relevant parties for the terms that define them in section 102.07(a)(1), the issue becomes whether "[FEMSA] owns or has an interest in the business of . . . [the Heineken brewers]" and also "own[s] or ha[s] a direct or indirect interest in the business . . . of [Cadena]." We must therefore determine whether these entities would be connected to one another in the manner proscribed by section 102.07(a)(1) if Cadena were granted the retailer's permit it seeks. This inquiry requires us to determine what it means to "own" or to have "an interest in" a brewer's and retailer's "business." The principal dispute concerns the extent to which section 102.07(a)(1) implies a requirement that a disqualifying "interest" carry with it some degree of cross-tier control and whether implying such a requirement is essential to avoid rendering the statute unconstitutionally vague. Another issue is whether the term "business" connotes only the brewer's or retailer's assets or something broader. Maintaining that the term "business" refers to individual assets, Cadena asserts that the corporate form shields the relevant corporate actors from the statute's reach because, absent veil-piercing, a parent company does not "have any property interest in its subsidiary's assets." *See Drilltec Techs., Inc. v. Remp*, 64 S.W.3d 212, 217 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

---

[4] For purposes of our analysis, we need not decide whether FEMSA could independently or derivatively qualify as a "brewer" or "retailer" based on its corporate relationships with Cadena and the Heineken brewers.

Because the terms "own," "interest," and "business" are undefined, we must apply their common meaning to the extent consistent with the context in which they are used and the statute's objective. In this case, the statute's context and objective are abundantly clear—strict separation between the alcoholic-beverage tiers. Accordingly, we must liberally construe the statute to achieve this legislative mandate.

Viewed through this prism, the term "interest" as used in section 102.07(a)(1) must logically encompass and extend beyond ownership interests, which are independently included in the statutory prohibition but otherwise come within the commonly understood meaning of "interest." Since the two terms are separately stated, having "an interest" necessarily includes something other than ownership interests, but the term may also include ownership interests to ensure comprehensiveness or to provide emphasis of breadth. *Compare City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003) ("[W]hen possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous."); *with In re Estate of Nash*, 220 S.W.3d 914, 918 (Tex. 2007) (noting that "there are times when redundancies are precisely what the Legislature intended" for comprehensiveness, emphasis, or both); *see also* Tex. Alco. Bev. Code § 102.01(b) (stating general policy of prohibiting any overlapping ownership interest as well as "related practices").

When considered on its own, the term "interest" invokes many different definitions and, without a modifier, could in the abstract be so broad as to be vague and ambiguous. *Cf. Maracich v. Spears*, ___ U.S. ___, 133 S. Ct. 2191, 2200–05 (2013) (acknowledging that phrase "in connection with" is susceptible of broad interpretation and is essentially "indeterminat[e] because connections, like relations, stop nowhere" but concluding that statutory provision at issue was not ambiguous in context of statute as whole (alteration in original) (internal quote marks omitted)).

However, we do not consider statutory language in a vacuum, and we cannot give an undefined statutory term a meaning out of harmony or inconsistent with other statutory provisions, even if the term would be susceptible of such a construction if standing alone. *Needham*, 82 S.W.3d at 318. For example, the term "retailer" is not defined in section 102.07 and could, in its ordinary meaning, apply to a wide variety of product vendors, but the breadth of the term is constrained by the statute's material purpose of regulating the alcoholic-beverage industry.

The term "interest" appears throughout the Alcoholic Beverage Code, often on its own and sometimes modified by terms like "pecuniary," "financial," "ownership," and "real."[5] Each of these modifiers connotes some type of commercial, economic, or financial interest. When used on its own within the statute, the term "interest" is typically characterized as being "an" or "any"

---

[5] *See, e.g.*, Tex. Alco. Bev. Code §§ 5.05(a)(3), (b) (prohibiting TABC commissioner from having "a pecuniary interest in an alcoholic beverage business" and having "an[y] interest in the sale or purchase of alcoholic beverages"); 6.05 (governing corporate liability when one corporation has "an ownership interest" in another specially permitted corporation); 11.10 (governing succession on the happening of certain events to "a person having an interest in [a] permit"); 11.47 (authorizing denial of original or renewal permit based on "financial interest" in retail beer sales permit or license); 11.48 (authorizing refusal of package store or mixed beverage permit based on ownership of "an interest of any kind in the premises, business, or permit of" package store or mixed-beverage establishment); 11.70 (liability of surety on bond supporting permit if "permittee or a person having an interest in a permit is finally convicted" of violating alcoholic-beverage laws or regulations); 22.16 (defining "public corporation" to include corporation or other legal entity "in which more than 35 persons hold an ownership interest"); 28.03 (requiring mixed-beverage-permit application to include information about "all persons having a financial interest of any kind in the granting of the mixed beverage permit"); 28.16 (prohibiting issuance of mixed-beverage permit to, among others, (1) person whose permit was cancelled based on specific statutory violation, (2) person who held "an interest" in such cancelled permit, (3) person with 50 or more percent direct or indirect stock ownership in such cancelled permit, and (4) person who resides with disqualified person); 37.04 (allowing holder of nonresident-seller permit to "have an interest in the business, assets, corporate stock, or permit of a person who holds a brewer's permit"); 54.03 (out-of-state winery direct shipper's permit may only issue to person who has no direct or indirect "financial interest" in Texas wholesaler or retailer); 61.44 (authorizing refusal of license based on applicant or other person's "financial interest" or applicant's "real interest" in certain alcoholic-beverage businesses); 102.06 (prohibiting relationships based on any direct or indirect interest in certain permits and based on being residentially domiciled with person holding "financial interest" in such permits).

interest, including direct and indirect interests, which would necessarily include all of the foregoing modified uses of the term.[6] Any of these types of interests would fall within the plain meaning of the term "interest," both on its own and as viewed in its regulatory environment. Any of these types of interests would therefore be sufficient to violate section 102.07(a)(1).

The limiting principle that derives from chapter 102's tenor as a whole is that the term "interest," as used in section 102.07(a)(1), broadly encompasses any commercial or economic interest that provides a stake in the financial performance of an entity engaged in the manufacture, distribution, or sale of alcoholic beverages. Chapter 102's stated objective of achieving strict separation between the alcoholic beverage tiers is crystal clear. And while controlling interests certainly run contrary to that objective, the legislature seems to have viewed even the potential for a lesser degree of influence and incentive arising from a prohibited interest to also be incompatible.

In the context of the Alcoholic Beverage Code, the term "interest" is purposefully broad, but its breadth is inherently limited to interests that are material to the purpose of the statute. The principal objective of chapter 102 is to ensure strict separation of the three tiers, including *any* overlapping ownership interests and related practices as well as other specifically prohibited relationships that give rise to the potential for influence and inducement. We hold that the term "interest" is unambiguous considered in this context and in relation to other uses of the term in the Code. We likewise conclude that the term is not so vague that it "exposes a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct," requires "men of common intelligence [to] guess at what is required," or gives rise to "a substantial risk of miscalculation by those whose acts are subjected to regulation." *See Texas Liquor Control Bd.*

---

[6] *See, e.g.*, *id.* §§ 102.10, .11, .18.

*v. Attic Club, Inc.*, 457 S.W.2d 41, 45 (Tex. 1970) (vagueness standard). As the Texas Supreme

Court explained in *Pennington v. Singleton*:

> [I]n the field of regulatory statutes governing business activity, greater leeway is allowed in applying the fair notice test. . . . "Most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded." Statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language. The statute should "convey sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."

606 S.W.2d 682, 689 (Tex. 1980) (internal citations omitted) (quoting *Boyce Motor Lines, Inc.*

*v. United States*, 342 U.S. 337, 340 (1952), and *United States v. Petrillo*, 332 U.S. 1, 7–8 (1947)).

The strict separation mandate not only reinforces the breadth of the statute, it also provides

substantive parameters that are sufficiently ascertainable by those subject to regulation under the

Code, especially as applied to Cadena's permit application, which involves a significant cross-tier

financial investment through stock ownership. In FEMSA's case, there is, at a minimum, a unity

of financial interests at more than one tier of the alcoholic-beverage industry.[7]

---

[7] Such a unity of interest also could be said to implicate tied-house concerns due to the potential for unfair trade practices, including favorable placement of the affiliated brewers' products at the retail level, which could enhance the brewers' domination in the local market by providing a competitive advantage. A common economic interest might also provide an incentive to employ pricing and marketing strategies having the potential to encourage excessive consumption of alcohol in derogation of the state's policy of protecting "the welfare, health, peace, temperance, and safety of the people of [this] state." *See* Tex. Alco. Bev. Code § 1.03. Influence, inducement, and incentive could create the potential for unfair trade practices to occur even in the absence of outright control, i.e., an affirmative ability to cause their occurrence, and the legislature could have reasoned that these evils could be effectively eliminated only by adherence to a policy of strict separation among the alcoholic-beverage industry's tiers.

Relying principally on the statute's historical underpinnings as addressing a threat of cross-tier control and industry monopolization, Cadena asserts that a disqualifying interest—ownership or otherwise—can only exist when there is some degree or type of actual control that permits "vertical integration or industry domination of the alcoholic beverage industry." Cadena appears to suggest that the *sole concern* of tied-house statutes is the avoidance of monopolies and cross-tier control. In light of the considerations noted above, we cannot agree. While those issues may have been a concern, the legislature extended the statute's reach more broadly.

As an initial matter, the word "control" is found nowhere in section 102.07(a)(1), although it is expressly used in other provisions in chapter 102. *See id.* §§ 102.01(h) (including as prohibited cross-tier relationship "a conspiracy or agreement to control or manage, financially or administratively, directly or indirectly, in any form or degree, the business or interests of a permittee of a different level"); .08 (addressing prohibited relationship between wholesale permittee and affiliate "regardless of whether the affiliation is corporate, by management, direction, or control, or through an officer, director, agent, or employee"). Imputing a generalized control standard into chapter 102 would render the specific uses of the term therein superfluous, which we must avoid when possible. *See City of San Antonio*, 111 S.W.3d at 29.

In addition, chapter 102 is replete with examples of the legislature's having opted to prohibit relationships that would not necessarily confer actual control but which would create the potential for influence or alignment of business interests. For example, in section 102.07, the legislature has prohibited a person with an interest in a manufacturer or wholesaler from (1) furnishing, giving, or lending any money, service, or thing of value to a retailer, (2) furnishing, giving, renting, lending or selling a retail dealer any equipment, fixtures, or supplies for use in selling or dispensing alcoholic beverages, (3) giving an excessive discount to a retailer, and (4) offering

20

any prize, premium, gift, or similar inducement to a retailer or its agent, servant, or employee. Tex. Alco. Bev. Code § 102.07(a)(2), (5), (7), (8). Furthermore, section 102.07's prohibited relationships extend not only to persons who actually own or have an interest in a brewer, but also to any agent, servant, or employee of such person. *Id.* § 102.07(a). As evidenced by these specific prohibitions, the legislature was concerned with more than the existence of actual control.

The bottom line is that the control requirement Cadena advocates has no foundation in the statutory text and is inconsistent with it. Cadena has not identified anything in the statute itself that supports the interposition of a control requirement with respect to the tied-house prohibitions generally and section 102.07(a)(1) specifically.

Cadena asserts, however, that any reading of the statute that is not limited to actual cross-tier control would lead to the absurd and unworkable result that even a de minimis stockholder interest in multiple tiers would violate the statue. Cadena strongly suggests that, given the complexities of modern corporate relationships and the prevalence of mutual funds and similar types of investments, it would be practically impossible to enforce the statute against every violator if a violation can be established in the absence of actual control. *See* Tex. Gov't Code § 311.021 ("In enacting a statute, it is presumed that . . . a result feasible of execution is intended."). We find these arguments unavailing for several reasons. First, Cadena suggests a false dichotomy between a controlling interest and a de minimis interest.[8] Under the Code, other interests—even significant ones—would fall short of the "control" on which Cadena insists. Second, FEMSA's interest in

---

[8] We express no opinion as to whether literally one share of overlapping stock ownership would violate section 102.07(a)(1). But we observe, parenthetically, that the Alcoholic Beverage Code expressly mandates that the TABC take a "risk-based approach to conducting its enforcement activities" with a focus on "(1) detecting serious violations that impact public safety; (2) monitoring entities that have a history of complaints and violations of this code; and (3) any other factors the commission considers important." Tex. Alco. Bev. Code § 5.361(a).

Cadena and the Heineken brewers—the only interest we are addressing here—is considerably more than de minimis. Finally, a permit to manufacture, distribute, or sell alcoholic beverages is a *privilege* granted by the legislature on terms and conditions embodied in the Alcoholic Beverage Code, as authorized by the 21st Amendment. *See* Tex. Alco. Bev. Code § 11.03 ("A permit issued under this code is a purely personal privilege and is subject to revocation as provided in this code."). Given the legislature's expressly stated intent to strictly prohibit "*any* overlapping ownership" between tiers, "other prohibited relationships" between tiers, and related practices, *see id.* § 102.01(a), (b), it would not be absurd or unreasonable to construe section 102.07(a)(1) in a manner that extends the reach of the statute to non-controlling ownership and other financial interests of the magnitude at issue here.

Courts cannot rewrite a statute in the guise of interpreting it. *In re Ford Motor Co.*, ___ S.W.3d at ___, 2014 WL 2994622, at *15. Nor are we at liberty to revise a statute to achieve a more desirable result. *See Stockton v. Offenbach*, 336 S.W.3d 610, 619 (Tex. 2011). "When a statute is unambiguous, our role is to apply it as written despite its imperfections." *Id.* Whatever merit there may be to Cadena's concerns about a statutory prohibition untethered to the concept of control, that is a matter for the legislature to address, not the courts.[9] There is simply nothing in the statute that supports inserting a controlling-interest requirement into section 102.07(a)(1), and we decline Cadena's invitation to encroach on the legislature's dominion. *See* Tex. Const. art. II, § 1 (mandating strict separation of powers among branches of government).

---

[9] Although Cadena contends that the lack of a control standard results in a statute that is vague and practically impossible to enforce, Cadena does not persuasively demonstrate why the "control" standard it advocates would be any easier to enforce. Ferreting out and establishing the existence of controlling relationships could prove to be at least as difficult as uncovering weaker cross-tier financial connections. More to the point, the legislature has not adopted such a test; it has only adopted the "interest" requirement.

22

Having construed the term "interest" in section 102.07(a)(1) to apply to the financial and economic interest FEMSA indirectly holds in both the Heineken brewers and Cadena, we now address Cadena's argument that a prohibited interest in "the business" of a brewer or retailer refers to a direct ownership interest in a business's assets, which, under the facts of this case, would require veil-piercing to invoke the statutory prohibition. Cadena argues that FEMSA cannot be said to have any ownership or other interest in *the business* of either the Heineken brewers or Cadena because mere stock ownership, regardless of the extent of such ownership, does not destroy the identity of the various corporations as distinct legal entities absent veil-piercing. Because stockholders have no property interest in corporate property, Cadena contends that FEMSA has no "interest" in either Cadena's or the Heineken brewers' business, as required to constitute a violation of section 102.07(a)(1). In response, the TABC asserts that veil-piercing principles are inapplicable to regulatory regimes and that, considering the economic realities of the relevant relationships, FEMSA plainly has an interest in the business of both the Heineken brewers and Cadena. *Cf. Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 637 (Tex. 2013) (in matters of economic regulation, "a plain-meaning determination should not disregard the economic realities underlying the transactions in issue").

The term "business" generally refers to "[a] commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain." *Black's Law Dictionary* 239 (10th ed. 2014); *accord* Tex. Att'y Gen. Op. No. DM-310 (1994), 1994 WL 728076, at *1–3 (term "business" as used in Alcoholic Beverage Code implies "a commercial or mercantile activity"). In both its ordinary meaning and as used in the Code, the term "business" is distinct from the specific assets held by a business. *See, e.g.*, Tex. Alco. Bev. Code §§ 37.04 ("A person who holds a nonresident seller's permit may have an interest in the business, assets, corporate

23

stock, or permit of a person who holds a brewer's permit."); 37.07 (prohibiting certain persons from "hold[ing] or hav[ing] an interest in the permit, business, assets, or corporate stock of a person authorized to import liquor into this state for the purpose of resale . . ."); 102.07(a)(1) (prohibiting certain persons from "own[ing] or hav[ing] a direct or indirect interest in the business, premises, equipment, or fixtures of a retailer"); 102.10 (prohibiting certain entities from having "any interest in the permit, business, assets, or corporate stock of a holder of a wholesaler's permit"); 102.18 (prohibiting certain entities from "hav[ing] any interest in the license, business, assets, or corporate stock of a holder of a general, local, or branch distributor's license"). While having an interest in the business may include having an interest in some or all of the business's assets, the plain meaning of the term "business," especially when viewed in context, is not necessarily so limited. *See id.* § 102.07(a)(1) (prohibiting not only interest in business but also precluding interests in assets such as premises, equipment, or fixtures). Accordingly, even if veil-piercing principles might otherwise apply in some regulatory contexts, which we need not decide, those principles are not implicated by the broad language the legislature employed in section 102.07(a)(1). In other words, the statute's plain language applies to FEMSA's own relationships, not relationships that have been imputed to FEMSA.[10]

In considering a comparably worded statute, the Texas Attorney General (AG) concluded that owning stock in a corporation with a subsidiary that sells alcoholic beverages constitutes an impermissible financial interest in an "alcoholic beverage business." *See* Tex. Att'y Gen. Op. No. DM-310 (1994), 1994 WL 728076, at *1–3. The statute at issue there, section 5.05(a)

---

[10] For this reason, we need not consider Cadena's challenge to the county judge's determinations that "[f]or licensing purposes, as a subsidiary of FEMSA, [Cadena] is a manufacturer" and "[f]or licensing purposes, as a subsidiary of FEMSA, [Cadena] has an interest in the business of a brewer."

24

of the Alcoholic Beverage Code, prohibits TABC commissioners and employees from (1) having "any financial connection with a person engaged in an alcoholic beverage business"; (2) holding "stocks or bonds in an alcoholic beverage business"; and (3) having "a pecuniary interest in an alcoholic beverage business." Tex. Alco. Bev. Code § 5.05(a). The question presented was whether section 5.05(a) "prohibits a member of the [TABC] from investing money through an investment advisory firm, which, using an unrelated broker, may invest the money in corporations that engage in the sale of alcoholic beverages." Tex. Att'y Gen. Op. No. DM-310 (1994), 1994 WL 728076, at *1. As the AG observed, the breadth and scope of the prohibition in section 5.05 unambiguously prohibits a financial relationship of any kind—direct or indirect—between a TABC commissioner or employee and "an alcoholic beverage business." *Id.* at *2. The principal issue concerned the meaning of the term "alcoholic beverage business." *Id.*

In construing that term, which is not statutorily defined, the AG considered the plain meaning of the words, the liberal construction mandated by section 1.03 of the Alcoholic Beverage Code, and the state's longstanding policy prohibiting state officials and employees from having any actual or potential conflict of interest. *Id.* at *2–3. The AG determined that the phrase "alcoholic beverage business," both in its ordinary meaning and in the relevant statutory context, refers to "a business involved in the commerce and merchandising of alcoholic beverages." *Id.* at *2. As a result, the AG concluded that the plain language in section 5.05(a) prohibits even indirect financial interests or relationships in such a business, including an investment in a corporation whose subsidiary engages in the sale of beer or alcoholic beverages. *Id.* at *2. In so holding, the AG necessarily recognized that the term "business" is broader than just the individual assets of the business. The AG explained that if section 5.05 were construed "to permit a member of the commission to hold stocks or any other pecuniary interest in a corporation that engages in the

25

sale of alcoholic beverages, even if such sales are conducted by one of the corporation's subsidiaries" and even if "the member's interest in the corporation involved in the alcoholic beverage business may be de minimis," there would be a potential or apparent conflict between the member's duty to the public and the member's financial interests, which would be repugnant to the public policy of this state as expressed in the Code and laws governing public servants. *Id.* at *3. Although acknowledging that the legislature may not have contemplated the existence of mutual funds and the complexities of modern corporate relationships when initially enacting section 5.05(a)'s predecessor more than a half century ago, the AG observed that any such concern was an issue to be addressed by the legislature. *Id.* at *3. Read in the context of the Alcoholic Beverage Code, we are persuaded that similar considerations bear on the construction of section 102.07(a)(1).

Cadena cites two other AG opinions that it contends compel the conclusion that stock ownership does not confer an interest in the business of a subsidiary unless the corporate veil is pierced under established veil-piercing principles. *See* Tex. Att'y Gen. Op. No. GA-0563 (2007), 2007 WL 2344759, at *1–5 (construing statute governing licenses for manufacturers and distributors of bingo equipment and supplies); Tex. Att'y Gen. Op. No. O-7039 (1946) (construing provision in predecessor to Alcoholic Beverage Code prohibiting a person from "hold[ing] or [having] an interest in more than five (5) Package Stores or the business thereof"). Both of these opinions are distinguishable to the extent that they do not implicate the statutory imperative of strict separation of the three-tiers of the manufacturing business; one of the opinions involves licensing under the Bingo Enabling Act, and the other involves consolidation only at the retail tier of the alcoholic-beverage industry. In any event, we do not find the analyses in either opinion controlling or persuasive with respect to the construction and application of section 102.07(a)(1). *See, e.g.*, *Holmes*

*v. Morales*, 924 S.W.2d 920, 924 (Tex. 1996) (AG opinions are "persuasive but not controlling" authority).

Applying section 102.07(a)(1)'s plain language in a manner consistent with the pervasive regulatory scheme enacted by the legislature and the strict-separation and liberal-construction mandates embodied therein, we hold that FEMSA would, if Cadena's permit application were granted, have "an interest in the business of a . . . brewer" and would also "have a direct or indirect interest in the business . . . of a retailer." Because granting Cadena's permit application would result in a relationship prohibited by section 102.07(a)(1), the trial court's judgment affirming the administrative order can be sustained based on section 61.43(a)(9) of the Alcoholic Beverage Code, which authorizes the county judge to deny a wine and beer retailer's off-premise permit if there are "reasonable grounds to believe" that "the applicant will conduct business in a manner contrary to law or in a place or manner conducive to a violation of the law." Tex. Alco. Bev. Code § 61.43(a)(9); *see also id.* § 26.03 (application and issuance process for wine and beer off-premises retailer permit is same for retail dealer's off-premise license).

Cadena contends that applying the relevant statutes to deny its permit application without evidence of actual control results in arbitrary and discriminatory enforcement in violation of equal-protection guarantees. To support this argument, Cadena points to evidence in the record that it contends establishes the present existence of billions of dollars of cross-tier investments. Cadena further points to its expert witness's testimony that it would be impracticable, if not impossible, to wholly avoid cross-tier investments in the modern marketplace. Moreover, the TABC admittedly lacks the resources—although not the authority or duty—to discover all violations and to enforce the statute against all violators, especially those arising from investments in mutual funds, defined contribution and benefit plans, and private equity or hedge funds. Although such

27

enforcement limitations could probably be found in almost every regulatory scheme, Cadena contends that the existence and magnitude of cross-tier investments identified by its expert witness establishes that it was denied equal protection of the law.

Equal protection under the law requires similar treatment for similarly situated entities unless there is a rational basis to support disparate treatment. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 939 (Tex. 1998). The Alcoholic Beverage Code requires the TABC to take a "risk-based approach" to enforcement and to focus on "serious violations that impact public safety." Tex. Alco. Bev. Code § 5.361. Assuming without deciding that Cadena's equal-protection claim was properly preserved,[11] the claim fails because there is no evidence that the TABC has granted a permit or license to an applicant with a similarly significant cross-tier investment interest.

For the foregoing reasons, we overrule Cadena's appellate issues.

**CONCLUSION**

FEMSA holds a 100% indirect stock-ownership interest in the business of an applicant for an alcoholic-beverage retailer's permit and a 20% indirect stock-ownership interest in three businesses that hold non-resident manufacturers' permits. Granting Cadena's application for a wine and beer retailer's off-premise permit would therefore result in a cross-tier relationship prohibited by section 102.07(a)(1) of the Texas Alcoholic Beverage Code. As a result, the trial court properly affirmed the administrative order under section 61.43(a)(9) of the Code. *See* Tex. Alco. Bev. Code § 61.43(a)(9) (authorizing county judge to deny wine and beer retailer's off-premise

---

[11] The TABC observes that Cadena did not raise an equal-protection claim in its petition for judicial review and therefore contends the claim is waived. Cadena effectively maintains that the issue was tried by consent because it was briefed in the trial court and the TABC responded to the argument. Because we conclude that Cadena's claim fails on the merits, we need not decide whether it was adequately raised in the trial court.

28

permit based on "reasonable grounds to believe" that "the applicant will conduct business in a manner contrary to law or in a place or manner conducive to a violation of the law"). Accordingly, we affirm the trial court's judgment affirming the administrative denial of Cadena's permit application.

_____
J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed:   September 5, 2014