ACCEPTED
03-16-00039-CV
14434525
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/22/2016 4:17:57 PM
JEFFREY D. KYLE
CLERK

No. 03-16-00039-CV

In the Third Court of Appeals
Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/22/2016 4:17:57 PM
JEFFREY D. KYLE
Clerk

_____

TEXAS ALCOHOLIC BEVERAGE COMMISSION,

*Appellant*,

v.

MARK ANTHONY BREWING, INC.,

*Appellee.*

_____

On Appeal from the 345th Judicial District Court of Travis County, Texas
_____

**REPLY BRIEF OF APPELLANT**
**TEXAS ALCOHOLIC BEVERAGE COMMISSION**

_____

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Litigation

NICHOLE BUNKER-HENDERSON
Chief, Administrative Law Division

KAREN L. WATKINS
Assistant Attorney General
State Bar No. 20927425
P. O. Box 12548
Austin, Texas 78711-2548
Karen.Watkins@oag.texas.gov
Telephone: (512) 475-4300
Facsimile: (512) 320-0167

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Contents.................................................................................................. ii

Index of Authorities............................................................................................ iv

Summary of the Argument.................................................................................. 1

Argument And Authorities .................................................................................. 3

I.  The trial court erred by allowing Mark Anthony to assert its First Amendment challenge to section 102.01 (h) for the first time after trial ................................... 4

    A.  Section 102.01(h) regulates conduct, not speech.......................................... 4

    B.  Mark Anthony's arguments on appeal demonstrate how TABC was prejudiced by the trial court's error.................................................... 6

II.  The First Amendment does not protect Mark Anthony's use of TGIF's name and marks because that speech relates to illegal activity. ..................................... 7

    A.  The First Amendment does not protect all speech about "lawful products," as Mark Anthony suggests ............................................................. 8

    B.  Mark Anthony's Amended Licensing Agreement with TGIF-MN violates section 102.01(h) ......................................................................... 11

        1.  Section 102.01 (h) prohibits relationships that allow cross-tier control of a permittee's "business or interests ............................... 11

        2.  The Amended Licensing Agreement allows TGIF to direct various aspects of Mark Anthony's business................................................. 15

        3.  Mark Anthony's arguments that section 102.01(h) does not mean what it says are unavailing.................................................................. 17

III.  Even if Mark Anthony's labels had been entitled to First Amendment protection, Texas' "thing of value" statutes and rules are constitutional .......... 23

    A.  Texas has a significant interest in maintaining its three-tier system for more than the protection of retailer independence................................... 24

B. Prohibiting a manufacturer from using a retailer's name on its products directly advances Texas' interest in maintaining separation between the tiers ........................................................................................................ 25

C. There is a good fit between the thing-of-value statutes and rules and preservation of the three-tier system ............................................................ 26

IV. Even If The Proposed Labels Had Been Protected Commercial Speech, the Challenged Statutes And Rules Do Not Violate The First Amendment........... 28

Conclusion and Prayer............................................................................................... 28

Certificate of Compliance............................................................................................ 30

Certificate of Service ................................................................................................... 31

iii

## INDEX OF AUTHORITIES

**CASES**

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 n.4 (1996).............................................................................................. 21

*Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*,
449 S.W.3d 154 (Tex. App.—Austin 2014, pet. granted).........................................13, 21

*Central Hudson Gas & Elec. v. Public Service Commission,*
447 U.S. 557 (1980)................................................................................................2, 8, 24

*Entergy Gulf States, Inc. v. Summers*,
282 S.W.3d 433 (Tex. 2009) ..................................................................................... 12

*Ford Motor Co. v. Texas Department of Tranportation*,
264 F.3d 493 (5th) Cir. 2001) .................................................................................. 9, 10

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949) ...............................................................................................18, 19

*In re M.M.M.*,
428 S.W.3d 389 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ........................ 24

*In re M.N.*,
262 S.W.3d 799, 802 (Tex. 2008)............................................................................... 12

*K Mart Corp. v. Cartier, Inc.*,
485 U.S. 176 (1988) ................................................................................................. 19

*Neel v. Texas Liquor Control Board,*
259 S.W.2d 312 (Tex. App.—Austin 1953, writ ref'd, n.r.e.)...................................21, 22

*Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*,
925 S.W.2d 659 (Tex. 1996) ..................................................................................... 12

*Pittsburgh Press Co. v. Commission on Human Relations*,
413 U.S. 376 (1973) ........................................................................... 9, 10

*Retail Digital Network, LLC v. Appellsmith,*
810 F.3d 638 (9ᵗʰ Cir, 2016) ................................................................... 24

*Retail Digital Network, LLC v. Gorsuch,*
No. 13-56069, 2016 WL 6790810 (9th Cir. Nov. 16, 2016) ........................... 24

*Stockton v. Offenbach*,
336 S.W.3d 610 (Tex. 2011) ................................................................... 18

*TGS-NOPEC Geophysical Co. v. Combs*,
340 S.W.3d 432 (Tex. 2011) ................................................................... 12

*TIC Energy and Chem., Inc. v. Martin*,
498 S.W.3d 68 (Tex. 2016) .................................................................... 12

## STATUTES

Tex. Alco. Bev. Code § 1.03 ................................................................... 13

Tex. Alco. Bev. Code § 5.31(b)(1) ........................................................... 30

Tex. Alco. Bev. Code § 5.31(b)(2) ........................................................... 30

Tex. Alco. Bev. Code § 5.31(b)3         30

Tex. Alco. Bev. Code § 6.03(i) ................................................................ 21

Tex. Alco. Bev. Code § 102.01 (a) ........................................................... 31

Tex. Alco. Bev. Code § 102.01 (b) ........................................................... 31

Tex. Alco. Bev. Code § 102.01(h) ....................................................... passim

Tex. Alco. Bev. Code § 102.07(a) ............................................................ 31

Tex. Alco. Bev. Code § 1.04(11) ....................................................................... 13

Tex. Gov't Code § 311.011(a) .......................................................................... 16

Tex. Gov't Code § 311.023(5) .......................................................................... 12

**RULES**

16 Tex. Admin. Code § 45.110 (c)(3) ................................................................. 4

Commission's Rules 45.110(c)(7) ..................................................................... 23

Commission's Rules 45.82(a)(7) ...................................................................... 23

Commission's Rules 45.110(c)(3) ..................................................................... 23

Tex. R. App. P. 33.1(a)(1) .............................................................................. 24

## OTHER AUTHORITIES

Black's Law Dictionary 239 (10th ed. 2014) ..................................................... 14

DICTIONARY.COM, http://www.dictionary.com/browse/manage?s=t
(last visited Dec. 16, 2016). ................................................................... 13

No. 03-16-00039-CV

In the Third Court of Appeals
Austin, Texas

_____

TEXAS ALCOHOLIC BEVERAGE COMMISSION,

*Appellant*,

v.

MARK ANTHONY BREWING, INC.,

*Appellee.*

_____

On Appeal from the 345th Judicial District Court of Travis County, Texas

_____

**REPLY BRIEF OF APPELLANT
TEXAS ALCOHOLIC BEVERAGE COMMISSION**

_____

TO THE HONORABLE JUSTICES OF THE THIRD COURT OF APPEALS:

COMES NOW Appellant Texas Alcoholic Beverage Commission, by and through its attorney of record, Ken Paxton, Attorney General of Texas, and the undersigned assistant attorney general, and replies to the Brief of Appellee Mark Anthony Brewing, Inc., (hereafter "MAB Brief") in this case.

**SUMMARY OF THE ARGUMENT**

During the trial of this case, Mark Anthony never alleged that, if Texas Alcoholic Beverage Code section 102.01(h) must be read to prevent manufacturers from licensing

intellectual property also used by retailers, it amounts to a prior restraint on commercial speech rights.[1]  Because Mark Anthony made that argument for the first time after trial, TABC was unaware of any need to adduce evidence of the significant governmental interests section 102.01(h) serves, the problems the section was intended to prevent, or the degree to which the statute ameliorates those problems.  The trial court erred by tacitly concluding that the First Amendment challenges Mark Anthony had asserted included a challenge to section 102.01(h).

Section 102.01(h) is relevant for other reasons.  It prevents a permittee in one tier from agreeing to allow a permittee in a different tier any degree of control over its business, even if the control is indirect.  Because Mark Anthony's Amended Licensing Agreement with TGIF-MN allows a retailer to exercise indirect control over many aspects of Mark Anthony's business, the Agreement violates section 102.01(h).  Mark Anthony's proposed use of the TGIF name and trademarks on its labels is, therefore, speech related to an illegal activity that the First Amendment does not protect.

However, even if the First Amendment had protected Mark Anthony's proposed speech, the statutes and rules Mark Anthony timely challenged satisfy all of the requirements of *Central Hudson Gas & Elec. v. Public Service Commission*.  447 U.S. 557 (1980).  The statutes directly advance Texas' interests in maintaining separation of the tiers of the alcoholic beverage industry and preventing the creation of tied houses.

---

[1]  Mark Anthony also did not allege that section 102.01(h) unconstitutionally impairs its contractual rights.  SCR 3-18.

Prohibiting a manufacturer's use of a retailer's name on its products removes the manufacturer's incentive to enter into an agreement that, at least according to Mark Anthony's expert, would almost certainly involve impermissible control of a member of one tier by a member of another. The alternatives that Mark Anthony suggests are not true alternatives. One rests on the erroneous assumption that TABC would know about all agreements that every industry member signed. The other *requires* creation of a tied house before TABC can act.

## ARGUMENT AND AUTHORITIES

The question that lies at the heart of this case is whether, by entering into an agreement with the affiliate of retailer, a manufacturer can evade the barriers that otherwise prevent it from beginning to vertically integrate with a retailer. TABC respectfully submits that it cannot. Mark Anthony, a manufacturer, wants to put the tradename and trademarks used by a retailer, TGI FRiDAY'S on the labels for its product. It acquired the right to use that name and those marks by entering into an agreement that allows TGIF to control, albeit indirectly, various aspects of Mark Anthony's business. Because Texas prohibits that type of control, the First Amendment does not protect Mark Anthony's proposed speech. However, even if the labels had contained protected speech, the statutes and rules that Mark Anthony timely challenged are a good fit to further the significant interest the State of Texas has in preventing the creation of tied houses.

3

**I.** **The trial court erred by allowing Mark Anthony to assert its First Amendment challenge to section 102.01 (h) for the first time after trial.**

**A.** **Section 102.01(h) regulates conduct, not speech.**

Mark Anthony argues that it timely asserted a constitutional challenge to section 102.01(h) because: (a) Mark Anthony sought a declaratory judgment that "**any** other statutory provisions, if they must be read to prohibit such labels, are unconstitutional under the First Amendment," (emphasis added); and (b) TABC argued that the labels were illegal speech because they violated Rule 45.110(c)(3). MAB Brief at 67-68. Neither argument excuses the trial court's error.

First, TABC does not contend that the labels are illegal speech **because** they violate Rule 45.110(c)(3).[2] Instead, TABC contends that the labels are not entitled to First Amendment protection because they relate to activity that violates section 102.01(h), i.e., a manufacturer's agreeing to allow a retailer control over any aspect of the manufacturer's business. Appellant's Brief at 10.

Second, Mark Anthony correctly reports that it sought a declaration of unconstitutionality of any statute that must be read to prohibit the proposed labels. However, TABC never asked the Court to read section 102.01(h) to prohibit the labels because section 102.01(h) regulates conduct, not speech. The section provides that:

> [n]o permittee may enter with a permittee of a different level or with another person or legal entity into a conspiracy or agreement to control or manage, financially or administratively, directly or indirectly, in any

---

[2] Of course, the labels do violate Rule 45.110(c)(3) because they result from Mark Anthony's having entered into a prohibited agreement with TGIF-MN. 16 Tex. Admin. Code § 45.110(c)(3).

form or degree, the business or interests of a permittee of a different level. Tex. Alco. Bev. Code § 102.01(h). TABC contended that, by entering into an agreement that allowed TGIF indirect control over aspects of its business, Mark Anthony violated section 102.01(h). Because the speech on the labels related to that illegal **conduct**, TABC argued that the labels were not entitled to First Amendment protection. 2 RR 30.

Mark Anthony tries to transform section 102.01(h)'s prohibition on conduct into a restriction on speech with its expert's testimony that every trademark licensing agreement "has to have" quality control provisions.[3] MAB Brief at 60. Mark Anthony's tacit argument is that: (a) because all trademark licensing agreements will contain quality control provisions,[4] (b) TABC's contention that section 102.01(h) prohibits *this* Licensing Agreement is the equivalent of a contention that section 102.01(h) prohibits all trademark licensing agreements, and, (c) therefore, section 102.01(h) amounts to an improper restraint on speech. There are a number of problems with this argument.

First, Mark Anthony cannot transform section 102.01(h) into a restraint on speech by offering expert witness testimony about licensing agreements and the

---

[3] Although Mark Anthony characterizes all of the Amended Agreement's control provisions as "quality control" measures, the Agreement allows control over more of the business than the product intended to bear the TGIF name and trademarks. *See* Section II. B. 1., below.

[4] Mark Anthony incorrectly states, on page 20 of its Brief, that "**TABC's** marketing expert and its trademark license agreement expert" testified that quality control provisions are standard in trademark licensing agreements. Emphasis added. The individuals who so testified were Mark Anthony's experts.

5

requirements of trademark law. Second, because TGIF-MN owned the name and marks that Mark Anthony proposed to use on its labels, Mark Anthony had no right to engage in its proposed speech before licensing the intellectual property from TGIF-MN. Section 102.01(h) did not prohibit Mark Anthony from licensing intellectual property to put on its labels, but it did prohibit Mark Anthony from entering into an agreement that allowed a member of another tier to control any part of its business, even indirectly.

Because Mark Anthony never alleged that section 102.01(h) was unconstitutional and TABC never contended that section 102.01(h) must be read to prohibit Mark Anthony's labels, the trial court erred by tacitly concluding that Mark Anthony had timely challenged the constitutionality of section 102.01(h).

## B. Mark Anthony's arguments on appeal demonstrate how TABC was prejudiced by the trial court's error.

Mark Anthony's brief underscores the prejudice TABC suffered as a result of the trial court's error. For example, Mark Anthony contends that TABC never adduced evidence of the harm section 102.01(h) was intended to prevent. MAB Brief at 18-21, and 70-71. Mark Anthony also observes that a state must prove that a "'preventative measure' *restricting commercial speech*"[5] will contribute to solving the serious problem it was intended to address and complains that TABC offered no such evidence.

---

[5] Again, section 102.01(h) does not even purport to regulate speech; instead, it expressly governs the conduct of TABC's permittees.

MAB Brief at 22 (emphasis added). The Court should not blame TABC for failing to adduce evidence on a claim Mark Anthony did not assert.

From the beginning of trial through closing arguments, Mark Anthony mentioned section 102.01(h) only once: to assert that TABC's argument that the Licensing Agreement violated section 102.01(h) was not before the court. *See e.g.*, CR 57. Nothing in the "decision tree" Mark Anthony submitted to the trial court includes a mention of the constitutionality of section 102.01(h); in fact, the only statutes it discussed were the "thing of value" statutes. *Id.* That litigation stance and a request that the trial court declare unconstitutional "any other statutory provisions, if they must be read to prohibit such labels" do not equate to an allegation that section 102.01(h) is an unconstitutional restraint on Mark Anthony's commercial speech rights. Because Mark Anthony did not timely challenge the constitutionality of section 102.01(h), the trial court erred by considering the claim.

## II. The First Amendment does not protect Mark Anthony's use of TGIF's name and marks because that speech relates to illegal activity.

Although the First Amendment does not protect commercial speech related to illegal activity, obviating any need for an analysis under *Central Hudson*, Mark Anthony addresses the legality of its proposed speech only at the end of its brief.[6] MAB Brief at 66-73. There, it argues only that: (1) speech concerns "lawful activity" if it is speech

---

[6] Mark Anthony includes some contentions in its Summary of the Argument that it advances nowhere else in the Appellees' Brief. TABC will address those arguments in this section.

"regarding lawful products," and (2) neither the United States Supreme Court's opinion in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, nor the Fifth Circuit's opinion in *Ford Motor Co. v. Texas Department of Transportation*, apply to this case. Neither argument is sound. Furthermore, both fail to analyze Mark Anthony's relationship with TGIF-MN and its affiliates in light of the broad prohibition on cross-tier control and management in section 102.01(h).

**A. The First Amendment does not protect all speech about "lawful products," as Mark Anthony suggests.**

Mark Anthony argues that speech concerns "lawful activity" if it is speech "regarding lawful products." MAB Brief at 68. From this statement, apparently the Court is to infer that all speech regarding "lawful products" is protected, regardless of the lawfulness of the activities surrounding the "lawful products." The suggested inference is NOT the law.

First, as Mark Anthony acknowledges, the first step in the *Central Hudson* analysis is to determine whether the speech at issue is "related to *unlawful activity*." MAB Brief at 12 and 24 (emphasis added), citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 564 (1980). As the United States Supreme Court there recognized, "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Central Hudson*, 447 U.S. at 563. In other words, First Amendment protection does not extend to "commercial speech related to illegal activity." *Id.* at 563-64.

8

Second, the two cited cases are directly on point. In *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376 (1973), the United States Supreme Court considered whether the city of Pittsburgh's ordinance "forbidding newspapers to carry 'help-wanted' advertisements in sex-designated columns" violated the First and Fourteenth Amendments. *Id.* at 378. The Court held that it did not, noting that

> [d]iscrimination in employment is not only commercial activity, it is illegal commercial activity under the Ordinance. We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes. Nor would the result be different if the nature of the transaction were indicated by placement under columns captioned "Narcotics for Sale" and "Prostitutes Wanted" rather than stated within the four corners of the advertisement.

*Id.* at 388 (footnote omitted). The Court also observed that, while employment discrimination might be less overtly illegal than narcotics sales and prostitution, the same principle should be applied. *Id.* In other words, an advertisement of illegal conduct is not the type of commercial speech entitled to the protection of the First Amendment.

The Fifth Circuit more recently considered whether the State of Texas could regulate economic conduct in a way that prevented an entity from publishing commercial speech. In *Ford Motor Co. v. Texas Department of Transportation,* 264 F.3d 493 (5th Cir. 2001), the court considered Ford's contention that statutes prohibiting it from selling vehicles directly to consumers through its website violated its commercial speech rights. *Id.* at 505. The court recognized that the challenged statute did not regulate speech, but instead "prohibit[ed] manufacturers from retailing motor vehicles to

9

consumers." *Id.* at 506. The ban on Ford's advertising retail sales of vehicles was, in the court's view, "an accompanying result" of the prohibition on manufacturer's conduct, i.e. retail sales of vehicles. *Id.* The court rejected the notion that a state was prohibited from regulating commercial conduct if, as a result, the speech of the regulated entity was in some manner restricted:

> The [United States] Supreme Court has made clear that "[a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity. *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 389, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973).

*Id.* at 506. The court concluded that Ford's website advertisement was part of an integrated course of conduct that violated Texas law and that, as a result, Ford's speech did not concern a lawful activity. Consequently, its First Amendment challenge to the statute prohibiting it from retailing vehicles to consumers failed. *Id.*

Notwithstanding these authorities, Mark Anthony argues that its intended use of the TGI FRiDAY's name and marks on its labels is entitled to First Amendment protection because "the product and selling it are perfectly lawful." MAB Brief at 69. But Mark Anthony's proposed speech cannot be viewed in isolation. It is part of a single and integrated course of conduct that violates Texas Alcoholic Beverage Code § 102.01(h). Therefore, as was the case in *Ford Motor Co.*, because section 102.01(h) prohibits conduct, the section may also, as a necessary corollary, have the ancillary effect

10

of preventing speech advertising that illegal conduct.[7]

**B.      Mark Anthony's Amended Licensing Agreement with TGIF-MN violates section 102.01(h).**

Because the United States Supreme Court has held that a state may prohibit certain conduct, as well as speech related to that prohibited conduct, Mark Anthony had the burden to establish that section 102.01(h) did not prohibit it from entering into its licensing agreement. Mark Anthony failed to carry this burden. The evidence actually establishes conclusively that Mark Anthony's agreements were unlawful under section 102.01(h). As a result, Mark Anthony's proposed speech is not protected by the First Amendment.

1.      *Section 102.01 (h) prohibits relationships that allow cross-tier control of a permittee's "business or interests."*

Mark Anthony argues that section 102.01 (h) could not possibly have been intended to prevent members of the alcoholic beverage industry from entering into trademark licensing agreements because all such agreements necessarily allow the licensor to control the quality of the product created by the licensee. MAB Brief at 64. The language the Legislature chose to use in section 102.01(h) demonstrates that Mark Anthony's argument is simply wrong.

a.      **Rules of statutory construction**. Proper construction of

---

[7] Although Mark Anthony assures this Court that *Central Hudson* "and other First Amendment authorities do not allow a state to use a statute governing conduct to render legal commercial speech illegal," MAB Brief at 22, it cites no such authorities. If Mark Anthony does provide the Court any such authorities, TABC requests an opportunity to respond.

11

section 102.01(h) is a question of law to be reviewed *de novo*. *TIC Energy and Chem., Inc. v. Martin*, 498 S.W.3d 68, 74 (Tex. 2016). The goal in construing any statute is to give effect to the Legislature's intent in enacting it. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). To discern the Legislature's intent, one begins with the statute's words. *Id.* Undefined words are given their ordinary and commonly understood meanings unless it is apparent from the context of the statute that they have different or more precise definitions. *Id.* Words and phrases must be read in context and construed according to the rules of grammar and common usage. Tex. Gov't Code § 311.011(a). Legislative intent is found in the words used; words not included are presumed to have been omitted purposefully. *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008). If the text of the statute is clear and unambiguous, it is determinative of legislative intent. *Martin*, 498 S.W.3d at 75.

In construing a statute, courts must presume that the Legislature intended the statute to comply with the Texas and United States constitutions and to favor the public interest over any private interest. Tex. Gov't Code § 311.021(1) and (5). They must also enforce the statute as written and "refrain from rewriting [the] text lawmakers chose." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009). However, even if a statute is not ambiguous on its face, a court may consider the consequences of particular constructions. Tex. Gov't Code § 311.023(5). Interpretations of the statute that defeat the purpose of the legislation must be rejected as long as another reasonable interpretation of the statute exists. *Nootsie, Ltd. v. Williamson Cty. Appraisal*

12

*Dist.*, 925 S.W.2d 659, 662 (Tex. 1996). Finally, and importantly in this case, the Legislature has directed that the Texas Alcoholic Beverage Code is to be liberally construed to protect the welfare, health, peace, temperance, and safety of the people of the State. Tex. Alco. Bev. Code § 1.03.

> **b.** **Application of the rules of construction to section 102.01.** Code section 102.01(h) provides:

> No permittee may enter with a permittee of a different level or with another person or legal entity into a conspiracy or agreement to control or manage, financially or administratively, directly or indirectly, in any form or degree, the business or interests of a permittee of a different level.

Tex. Alco. Bev. Code § 102.01(h). The only Code-defined term used in section 102.01(h) is "permittee," which the Code provides is a "person who is the holder of a permit provided for in this code, or an agent, servant, or employee of that person." Tex. Alco. Bev. Code § 1.04(11). Because that is the only defined term, all of the other words in the section have their commonly understood and ordinary meanings.

A person "controls" something if she exercises authority over it or directs or regulates it. THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 290 (10th ed. 1981). She manages something if she "handle[s], direct[s], govern[s], or control[s it] in action or use." *Manage Definition*, DICTIONARY.COM, http://www.dictionary.com/browse/manage?s=t (last visited Dec. 16, 2016).

This Court has had occasion to consider the meaning of the terms "business" and "interest" as those terms are used in Chapter 102 of the Code. *Cadena Comercial*

13

*USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 449 S.W.3d 154, 164-171 (Tex. App.—Austin 2014, pet. granted). The Court observed that "Chapter 102's stated objective of achieving strict separation between the alcoholic beverage tiers was crystal clear," *id.* at 166, and that this goal informed the Court's analysis. After noting that the term "interest" has a plethora of meanings and is used in many of the Code's provisions, the Court concluded that, as used in Code section 102.07(a)(1), the term "interest" "broadly encompasses any commercial or economic interest that provides a stake in the financial performance of an entity engaged in the manufacture, distribution, or sale of alcoholic beverages." *Id.* at 166. In addition, the Court noted that the term "'business' generally refers to '[a] commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain.'" *Id.* at 169, citing BLACK'S LAW DICTIONARY 239 (10th ed. 2014). The Court thus held that, in its ordinary meaning and as used in the Code, the term "business" is distinct from – and broader than – the specific assets held by a business. *Id.*

Section 102.01(h)'s plain language thus reveals an intent to prohibit a permittee from one tier from entering into *any* agreement with *anyone* that would allow a permittee from a different tier to govern or regulate *any* aspect of the work of the first permittee in *any* way, to *any* degree, in *any* form. Interpreting section 102.01(h) to have the broadest possible reach is consistent with both the language the Legislature chose and Chapter 102's goal of maintaining separation between the tiers of the alcoholic beverage industry. Thus, section 102.01(h) does more than prohibit a member of the retail tier

14

from directly or indirectly owning a controlling interest in Mark Anthony. It prohibits that retailer from directly or indirectly controlling or managing **any aspect** of Mark Anthony's business – the business of manufacturing alcoholic beverages for sale – in any form or degree.

2. *The Amended Licensing Agreement allows TGIF to direct various aspects of Mark Anthony's business.*

Mark Anthony asserts that the Amended Licensing Agreement "does not give the [TGIF] restaurants, or even their affiliate, the owner of the TGIF brand, any control over Mark Anthony." MAB Brief at 19. The terms of the Amended Licensing Agreement belie this assertion.

Although Mark Anthony's original Licensing Agreement with TGIF-MN was amended shortly before trial to eliminate some of the provisions that TABC's expert had identified as problematic, 2 RR 88-89; 3 RR 160-180, the Amended Agreement continues to subject significant aspects of Mark Anthony's business to control by TGIF-MN and, through TGIF-MN, by the Texas retail permittee. For example, the Agreement gives Mark Anthony the right to use the TGIF name and marks only on products that TGIF has approved for "type[], presentation[] and style[]." 4 RR Exh. 21 at ¶ 2.A; *see also* ¶ 5.B. ("No Licensed Products . . . shall be manufactured, . . . promoted, marketed, sold or distributed without the approval of Friday's . . ..").  Even after TGIF has previously approved a product to be packaged using the TGIF name and marks, the Amended Agreement specifies that TGIF will test the product on an ongoing basis

15

and may, if it finds the quality of the product has deteriorated and would harm TGIF's reputation, require that the products be withdrawn from the market and destroyed. *Id.* at ¶ 5.G. These are the provisions that Mark Anthony describes as "quality control" provisions. *E.g.,* MAB Brief at 2, 19 and 20.

The Amended Agreement grants TGIF more rights to control Mark Anthony's business than are necessary to control the quality of the product on which TGIF's trade name and marks are to be used.[8] The Amended Agreement obliges Mark Anthony to spend a certain amount each contract period on "trade support, advertising, promotion and merchandising of the licensed products." 4 RR Exh. 21 at ¶ 6.B. The Amended Agreement requires that Mark Anthony comply with Friday's code of conduct and, in addition, to ensure that any Mark Anthony subcontractor does, as well. 4 RR Exh. 21 at ¶ 3.F. The code of conduct, appended to the Amended Agreement as Exhibit G, requires that Mark Anthony and its subcontractors abide by labor laws, workplace safety laws, and criminal laws preventing fraud and bribery. *Id.* at Exhibit G. It also purports to require Mark Anthony and its subcontractors to modify their production and/or operational processes, substitute materials, and recycle or re-use materials to reduce waste and to refrain from using endangered varieties of wood. *Id.* Finally, the Amended Agreement requires Mark Anthony to "cooperate with Friday's in the resolution of"

---

[8] Section 102.01(h) clearly bars Mark Anthony from agreeing that a retailer may, even indirectly, control the composition or production of Mark Anthony's beverages. Even if such controls had been proper, however, additional provisions of the Amended Agreement violate section 102.01(h).

complaints involving Mark Anthony's products bearing the TGIF name and marks as well as any claims of bodily injury or death or serious property damage. *Id.* at ¶ 15. These types of control are not related to quality.

Examination of the Amended Agreement reveals, beyond question, that it affords TGIF-MN – and, through TGIF-MN, its affiliated entity, TGI FRiDAY's, Inc., a Texas retail permittee – the right to control many aspects of Mark Anthony's business. As a result, the Amended Agreement violates section 102.01(h).

            3.      *Mark Anthony's arguments that section 102.01(h) does not mean what it says are unavailing.*

Mark Anthony advances several arguments in an attempt to induce the Court to ignore both the language of section 102.01(h) and the control the Amended Agreement gives TGIF over Mark Anthony's business. None are valid.

First, Mark Anthony argues that the Legislature could not possibly have intended to prevent members of the alcoholic beverage industry from entering into trademark licensing agreements because the Legislature presumably knew that the law of trademarks requires the licensor to exercise quality control over the product to which the trademark is applied or risk being found to have abandoned its trademark. MAB Brief at 64-66. The problem with this argument is that, if the Legislature is presumed to have known trademark law when it enacted section 102.01 in 1977, its choice to prohibit **any** agreement that would allow a permittee of one tier to control or manage, directly or indirectly and in any form or degree, the business or interests of a permittee

17

of another tier would have to stand.  The Legislature, presumably knowing about the possibility for abandonment of a mark or name, did not draft 102.01(h) to prohibit all agreements that give a retailer any form or degree of control over a manufacturer's business EXCEPT for trademark licensing agreements.  As a result, section 102.01(h) should be construed to implement the Legislature's purposeful choice to make no exception to the control prohibition.  Because a court is not "free to rewrite a statute to reach a result it might consider more desirable in the name of statutory construction," *Stockton v. Offenbach*, 336 S.W.3d 610, 619 (Tex. 2011), the trial court should not have accepted Mark Anthony's invitation to engraft an exemption onto section 102.01(h).

Another problem with this argument is that it attempts to use the speech rights acquired by executing the Amended Agreement to legitimize execution of the Agreement, which is prohibited by the Code.  The United States Supreme Court rejected a similar argument in *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949).  There, in response to picketers' contention that being enjoined from carrying placards outside Empire's place of business unconstitutionally infringed their free speech rights, the Court stated that

> . . . it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed.  Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade[,] as well as many other agreements and conspiracies deemed injurious to society.

18

*Id.* at 502 (citations omitted).

It is evident that Mark Anthony is putting the cart before the horse. Before Mark Anthony entered into the Agreement, it had no right to "speak" by putting the TGIF trade name and trademarks on its labels. *See, e.g., K Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 185 (1988) ("Trademark law, like contract law, confers private rights, which are themselves rights of exclusion."). Mark Anthony's willingness to enter into the Agreement is an acknowledgement of this fact. Consequently, section 102.01(h) outlawed conduct – a manufacturer's entry into a licensing agreement that afforded a retailer the right to control or manage aspects of the manufacturer's business – at a time when Mark Anthony **had no right** to engage in the speech it now contends is entitled to First Amendment protection. Like the Court in *Giboney*, this Court should reject Mark Anthony's invitation to use the First Amendment to shield otherwise illegal conduct with speech.

Second, Mark Anthony contends that TABC cannot point to any statutory language that makes it illegal for a manufacturer of alcoholic beverages to enter into an agreement like the Amended Agreement. MAB Brief at 21. As noted in the previous section of this Reply Brief, TABC has repeatedly stated that the Amended Agreement violates section 102.01(h); it is a necessary corollary that any agreement with similar

19

provisions would violate section 102.01(h), as well.[9] Mark Anthony correctly points out that section 102.01(h) cannot prevent it from entering into a trademark licensing agreement in another jurisdiction and selling its products there. It does not follow, however, that Mark Anthony may sell, in Texas, the fruit of conduct that Texas has prohibited.

Third, Mark Anthony argues that there are other, less restrictive means of preventing the "hypothetical possible harm." MAB Brief at 21-22. This argument is based on the unfounded assumptions that: (1) section 102.01(h) regulates speech, not conduct; and (2) Mark Anthony's proposed speech is legal. As to the first assumption, it is clear from both section 102.01(h)'s language and the sequence of Mark Anthony's actions that section 102.01(h) regulates conduct. Furthermore, as the entirety of Section II. of this Reply Brief demonstrates, Mark Anthony's proposed speech is illegal and not entitled to First Amendment protection.

Although Mark Anthony argues that maintenance of Texas' three-tier system for regulating the alcoholic beverage industry is not an end in itself, MAB Brief at 30, it acknowledges that the United States Supreme Court has deemed such systems "unquestionably legitimate." *Id.* What Mark Anthony fails to acknowledge is that states that have three-tier systems have a significant interest in maintaining them.

---

[9] TABC has never argued that ***all*** trademark licensing agreements are prohibited by section 102.01(h). It has argued only that, because the Agreement in this case allows TGIF control over Mark Anthony's business, it violates section 102.01(h).

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 493 n.4 (1996). As this Court observed in *Cadena*, the Code is "crystal clear" that the Legislature intends there to be strict separation of the three tiers of the alcoholic beverage industry. 449 S.W.3d at 166. Indeed, the Legislature has stated unequivocally that it is the public policy of this State:

> to maintain and enforce the three-tier system (strict separation between the manufacturing, wholesaling, and retailing levels of the industry) and thereby to prevent **the creation** or maintenance of a 'tied house' as described and prohibited in section 102.01 of this code."

Tex. Alco. Bev. Code § 6.03(i)(emphasis added). In Chapter 102, the Legislature specifically authorized TABC to conduct investigations and request information "necessary to enforce this section and to provide strict adherence to a general policy of prohibiting the tied house and related practices." Tex. Alco. Bev. Code § 102.01(b). As used in section 102.01, the term "tied house" means:

> any overlapping ownership or other prohibited relationship between those engaged in the alcoholic beverage industry at different levels, that is, between a manufacturer and a wholesaler or retailer, or between a wholesaler and a retailer, as the words 'wholesaler,' 'retailer,' and 'manufacturer' are ordinarily used and understood . . ..

Tex. Alco. Bev. Code § 102.01 (a). It is clear that, in the sixty-three years that have passed since this Court issued its decision in *Neel v. Texas Liquor Control Board,* 259 S.W.2d 312 (Tex. App.—Austin 1953, writ ref'd, n.r.e.), the Legislature has felt the need to expand the definition of the term "tied house."

Mark Anthony's reliance on *Neel*'s definition of the term "tied houses" and its expert's testimony that the goal of the three-tier system is to protect the independence

of retailers is unavailing in the face of the Legislature's prohibitions on other types of cross-tier relationships. As this Court recognized, "the [L]egislature seems to have viewed even the potential for a lesser degree of influence [by a member of one tier over a member of another]" to be incompatible with the notion of separation of the tiers. 449 S.W.3d at 166. Consequently, construing section 102.01(h) to permit the creation of a cross-tier relationship that allows a member of one tier to control the business of a member of another tier thwarts the legislative goal and, essentially, rewrites the statute.

An example of the harm that could flow from Mark Anthony's proposed construction of section 102.01(h) is helpful. If the section does not prohibit a member of the manufacturing tier from licensing the trade name of a member of the retail tier, allowing the retailer (or its nominally separate affiliate) to control the quality of the manufacturer's product, then the statute also cannot prohibit a retailer from licensing the trade name of a manufacturer to use on the retailer's establishment. Permitting such relationships to be formed has at least a significant potential for a return to circumstances that existed before Prohibition: (1) manufacturers would have retail establishments "tied" to them by the latter's use of the manufacturer's name, and patrons of that establishment would expect to be able to consume that manufacturer's products; (2) other manufacturers would be less likely to sell to the retailer advertising the tradename of their competitor and, instead, would want their own "tied" retailers, causing a proliferation of retail establishments; and (3) the manufacturer-tied retailers would compete with one another in ways that, while promoting alcohol sales, would

have little regard for the effects of such competition on society. This result cannot possibly have been what the Legislature intended, as it is exactly the type of tied house that even Mark Anthony agrees the three-tier system was designed to prevent. MAB Brief 27-29.

The language of section 102.01(h), while broad, is specifically targeted to the Legislature's objective: maintaining strict separation between the tiers of the alcoholic beverage industry. The trial court erred by construing the section in a way that allows members of one tier to enter into licensing agreements with members of other tiers (or their affiliates) allowing for cross-tier control. Because the trial court's error has the potential to rend the three-tier system asunder, that court's judgment should be reversed, and judgment should be rendered that Mark Anthony take nothing on its claims that Texas Alcoholic Beverage Code sections 102.07 and 102.15 and the Commission's rules 45.73(e), 45.82(a)(7), 45.110(c)(3), and 45.110(c)(7) violate its commercial speech under the First Amendment.

## III. Even if Mark Anthony's labels had been entitled to First Amendment protection, Texas' "thing of value" statutes and rules are constitutional.

The parties agree that statutes or rules may only regulate commercial speech constitutionally if they "directly advance" a significant governmental interest and are not more restrictive than necessary to serve that interest. TABC's Brief of Appellant at 22; MAB Brief at 10, 12.

Mark Anthony now suggests that this Court should analyze the constitutionality

23

of the statutes and rules it challenged under heightened scrutiny. MAB Brief at 13.

Mark Anthony did not make this argument in the trial court. SCR 3-18. Because the

United States Supreme Court issued its decision in *Sorrell v. IMS Health, Inc.*,[10] in 2011

and the trial of this case took place in March 2013, Mark Anthony's failure to apprise

the trial court of a belief that *Sorrell*'s heightened standard applied to this case amounted

to a waiver of that contention. Tex. R. App. P. 33.1(a)(1); *In re M.M.M.*, 428 S.W.3d

389, 397 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Mark Anthony tried its

entire case on the premise that *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,

447 U.S. 557 (1980), was the controlling authority. Therefore, *Central Hudson* is the

standard against which the trial court's decisions should be measured.[11]

## A. Texas has a significant interest in maintaining its three-tier system for more than the protection of retailer independence.

TABC has always argued that maintaining the integrity of Texas' three-tier

system of alcoholic beverage regulation, including the strict separation of the tiers, is

the governmental interest served by the statutes and rules that Mark Anthony

challenged. 2 RR 30-31. Although the trial court did not specifically find that

maintaining the integrity of the three-tier system was a substantial governmental

interest, she acknowledged that TABC had asserted an interest in "preserving or

---

[10] 564 U.S. 552 (2011).

[11] Mark Anthony also waived any argument that *Retail Digital Network, LLC v. Appelsmith*, 810 F.3d 638 (9th Cir. 2016), applies to this case. Furthermore, the Ninth Circuit granted a motion to rehear that case en banc. *Retail Digital Network, LLC v. Gorsuch*, No. 13-56069, 2016 WL 6790810 (9th Cir. Nov. 16, 2016).

24

strengthening the 'three-tier system.'" CR 101, Finding 19.

**B.    Prohibiting a manufacturer from using a retailer's name on its products directly advances Texas' interest in maintaining separation between the tiers.**

The trial court erred as a matter of law by finding that "[a]ny effect of a malt beverage retailer name ban on the 'three-tier system' is indirect, attenuated, and speculative," CR 101, Finding 20, because the evidence conclusively established that Mark Anthony and TGIF created an improper cross-tier relationship, directly breaching the wall between those who manufacture and those who retail malt beverages so that Mark Anthony would have the right to put TGIF's name and marks on its malt beverage products.  Mark Anthony consistently asserted that the "quality control" provisions of the Amended Agreement were a necessary predicate to Mark Anthony's proposed speech because, without them, TGIF-MN would risk being deemed to have abandoned its trade name and trademarks.  MAB Brief at 66.  Yet, section 102.01(h) specifically prohibits the creation of a cross-tier relationship involving any provision that allows a member of one tier to manage or control, even indirectly, any aspect of the business of a member of another tier.  Enforcing the "thing of value" statutes and rules removes any motivation a member of one tier might have to enter into such prohibited agreements with members of other tiers or their affiliates.  As a result, construing sections 102.07(a) and 102.15(a) to ban a manufacturer's use of a retailer's name on the labels for the manufacturer's products directly furthers Texas' interest in maintaining the integrity of its three-tier system.

**C. There is a good fit between the thing-of-value statutes and rules and preservation of the three-tier system.**

Mark Anthony asserts that banning a manufacturer from using a retailer's name on its product labels is "not narrowly tailored to advance any substantial governmental interest," MAB Brief at 44, because there are alternative methods of addressing Texas' interests in preventing the creation of tied houses that do not restrict speech. MAB Brief at 21-22. It asserts, first, that TABC can ask that parties to a licensing agreement remove problematic terms from that agreement. *Id.* at 22. Second, it contends that, if the parties to the licensing agreement refuse to remove any improper terms voluntarily, TABC can "try to prove a violation." *Id.* Neither of these avenues is a true alternative to prohibiting the creation of a tied house.

As to the first alleged alternative, Mark Anthony contends that its removal of problematic provisions from its own Licensing Agreement indicates that voluntary compliance with regulators' requests is a viable alternative to a prohibition on creating prohibited relationships. *Id.* at 22. Yet, TABC was only aware of the terms of the Amended Agreement because Mark Anthony had sued to invalidate the rules and statutes TABC is charged with enforcing. Industry members are currently not required to provide TABC copies of their agreements with third parties. Consequently, TABC does not know whether any permittee has already entered into an agreement that violates section 102.01(h). In addition, as shown in section II., above, the Amended Agreement continues to include provisions that allow TGIF to control aspects of Mark

26

Anthony's business. As a matter of law, the trial court erred by concluding that a request for voluntary compliance was a viable alternative to the retailer-name ban.

Ignoring evidence showing concerted operations by Mark Anthony and TGIF almost immediately after execution of the Licensing Agreement, Mark Anthony asserts there is no evidence that the retailer-name ban is tailored to address a serious problem. MAB Brief at 45-46. To support this contention, Mark Anthony first inaccurately characterizes the testimony of TABC's assistant chief in charge of special investigations as indicating that TABC might not currently be investigating improper cross-tier relationships. *Id.* at 46. Chief Jones actually testified that, as of the date of trial, TABC had 15-20 allegations of improper cross-tier relationships to investigate, but man-power only to work five of those cases. 3 RR 14-16. Dismissing evidence of its own improperly collaborative work with TGIF, Mark Anthony states that its general counsel terminated that practice "as soon as he discovered it." MAB Brief at 47. Mark Anthony's general counsel putting a stop to collaborative marketing efforts is: (1) no evidence that such conduct will not resume after the conclusion of this litigation, and (2) no evidence that other manufacturers and retailers who would enter into licensing agreements if this lawsuit succeeds would not engage in such collaborative marketing efforts, further eroding the walls that Texas has erected between members of different tiers of the alcoholic beverage industry.

**IV**. **Even If The Proposed Labels Had Been Protected Commercial Speech, the Challenged Statutes And Rules Do Not Violate The First Amendment.**

The retailer-name ban liminates the incentive for a manufacturer to enter into a licensing agreement with a retailer or one of its affiliates. Because, according to Mark Anthony's expert, such agreements necessarily include provisions authorizing the retailer or its affiliate to control aspects of the manufacturer's business – and because the terms of the Amended Agreement in this case demonstrate that such agreements afford the retailer and/or its affiliate quite extensive control over aspects of the manufacturer's business – the retailer-name ban directly and materially advances Texas' policy of maintaining strict separation between the tiers of the alcoholic beverage industry and preventing the creation of tied houses. The evidence reveals that, rather than furthering that policy, the alternatives Mark Anthony suggested would foster the creation of tied houses, leaving it to TABC to ferret out and prove the existence of those improper relationships after they have been in operation for some time. Therefore, even if Mark Anthony's proposed speech had related to legal activity, the statutes and rules that prevented approval of that proposed speech pass the *Central Hudson* test.

## CONCLUSION AND PRAYER

A manufacturer of alcoholic beverages may not obtain the right to use a retailer's name and trademarks on the labels for its products by agreeing that the retailer may control its business, even indirectly or to a limited extent. Because entering into such

28

an agreement is prohibited by Texas law, the First Amendment does not protect commercial speech only possible because of that prohibited agreement. As a result, the trial court erred as a matter of law in requiring TABC to prove that the statutes and rules that TABC challenged met the standard set out in *Central Hudson* and by invalidating Code sections 102.07(a), 102.15(a) and 102.01(h), as well as Rules 45.73(e), 45.82(a)(7), 45.110(c)(3), and 45.110(c)(7).

For all of the reasons asserted above and in its original Brief of Appellant, the Texas Alcoholic Beverage Commission respectfully requests that this honorable Court reverse the trial court's October 27, 2015 judgment and render judgment that Mark Anthony Brewing, Inc., take nothing; in the alternative only, Appellant respectfully requests that this honorable Court reform the trial court's judgment to eliminate the declaration that 102.01(h) violates the First Amendment; and for such other and further relief to which it has shown itself to be entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

29

NICHOLE BUNKER-HENDERSON
Chief, Administrative Law Division


  /s/ Karen L. Watkins
KAREN L. WATKINS
State Bar No. 29027425
Assistant Attorney General
Administrative Law Division
OFFICE OF THE ATTORNEY GENERAL
P. O. Box 12548, MC-018
Austin, Texas  78711-2548
Tel: (512) 475-4208
Fax: (512) 320-0167
karen.watkins@oag.texas.gov

*Counsel for Appellant Texas Alcoholic Beverage Commission*


## CERTIFICATE OF COMPLIANCE

I certify that the Appellant's Reply Brief submitted complies with Texas Rules of Appellate Procedure 9.4(i)(2) because this document contains 7,283 words.  Word is the word processing software that was used to prepare this filing and to calculate the document's word count.

  /s/ Karen L. Watkins
Karen L. Watkins
*Counsel for Appellant Texas Alcoholic Beverage Commission*

# CERTIFICATE OF SERVICE

I, the undersigned counsel for Appellant, do certify that, on December 22, 2016, a true and correct copy of this Reply Brief of Appellant Texas Alcoholic Beverage Commission was served on the following counsel for Appellee Mark Anthony Brewing, Inc., by electronic mail and/or e-service:

P.M. Schenkkan
Mary A. Keeney
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2200
Austin, Texas 78701-3744
(512) 480-5673 Telephone
(512) 480-5873 Facsimile
pschenkkan@gdhm.com
mkeeney@gdhm.com

Jack Martin
Lou Bright
3345 Bee Caves Road, Suite 105
Austin, Texas 78746
(512) 473-0300 Telephone
(903) 386-2714 Facsimile
jmartin@jmartinlaw.com
lou-bright@outlook.com

**ATTORNEYS FOR APPELLEE**
**MARK ANTHONY BREWING, INC.**

 /s/ Karen L. Watkins
Karen L. Watkins
*Counsel for Appellant Texas Alcoholic Beverage Commission*